IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

**AHERN RENTALS, INC.,**          )
                                  )
          Plaintiff,              )
                                  )          Case No.:  4:20-cv-1565
     vs.                          )
                                  )          **JURY TRIAL DEMANDED**
**EQUIPMENTSHARE.COM INC, and**   )
**EZ EQUIPMENT ZONE LLC,**        )
                                  )
          Defendants.             )

## COMPLAINT

Plaintiff Ahern Rentals, Inc. ("Plaintiff" or "Ahern"), by and through its undersigned attorneys, and for its causes of action against Defendant EquipmentShare.com, Inc. ("EquipmentShare" or "Defendant EquipmentShare") and Defendant EZ Equipment Zone LLC ("EZ" or "Defendant EZ," collectively "Defendants") alleges and states as follows:

## INTRODUCTION

1.     This action concerns EquipmentShare's systematic and concerted collaboration with EZ to take advantage of EquipmentShare's improper solicitation of Ahern's employees and customers and the theft of confidential and proprietary trade secrets and other confidential information belonging to Ahern.  Specifically, EquipmentShare has raided Ahern's talented employees and confidential, proprietary, and/or trade secret information in an effort to grow its business, at Ahern's expense, and now, upon information and belief, has conspired with EZ by providing it with these stolen resources to grow EZ's business as well.

2.     Plaintiff Ahern is North America's largest independently-owned equipment rental company with locations nationwide and over a 60-year history of experience in the equipment rental industry.  In addition to equipment rentals, ranging from heavy equipment to hand tools and

high reach equipment, Ahern offers sales of new and used equipment, plus servicing.  Ahern earned its success by cultivating long-term relationships with customers and heavily investing in its employees through training and development programs.

3.      Defendant EquipmentShare is a newcomer to the industry, relative to the long-standing experience of Ahern.  EquipmentShare has sought to dramatically increase its market share in the industry at Ahern's expense, in only a matter of a few years, by exploiting Ahern's hard work, expertise, and experience by engaging in a highly-organized conspiracy to steal these assets.

4.      In early to mid-2017, EquipmentShare began its attack on Ahern by targeting Ahern's employees, and directing outgoing Ahern employees to steal Ahern's confidential, proprietary, and/or trade secret information immediately before they left Ahern to begin working for EquipmentShare.  In some instances, outgoing Ahern employees intentionally damaged Ahern's relationship with customers – which Ahern built over decades – while still on Ahern's payroll.  EquipmentShare, along with former Ahern employees, conspired against Ahern to misappropriate Ahern's confidential, proprietary, and/or trade secret information. EquipmentShare was able to effectively steal significant portions of Ahern's business in markets nationwide by soliciting Ahern employees and obtaining and subsequently exploiting Ahern's confidential, proprietary, and/or trade secret information.

5.      In response to EquipmentShare's improper attacks, Ahern has filed a number of lawsuits against EquipmentShare and Ahern's former employees, who have breached the former employees' covenants with Ahern.  Some of these cases have been consolidated as Multidistrict Litigation before the Honorable Judge Phillips in the Western District of Missouri of the United States District Court.  *See In Re Ahern Rentals, Inc., Trade Secret Litigation*, Case No. 20-02945-

2

MD-C-BP (hereinafter "MDL").[1]  In addition, Ahern has filed lawsuits against EquipmentShare and Ahern's former employees in several state court actions, which are not a part of the MDL.[2]

6.      The RICO action consolidated under the MDL, as identified in Exhibit 1, targets EquipmentShare's nationwide conspiracy and other tortious misconduct.  The employment actions, the remaining lawsuits identified in Exhibit 1, concern contract and tort-based claims against one or more former Ahern employees, in addition to related claims against EquipmentShare.  The defendants in these employment actions used Ahern's contractually protected information, which they discerned solely from and during their employment with Ahern, to steal customers and artificially build market share for EquipmentShare, while damaging Ahern. Each action filed by Ahern against EquipmentShare seeks to protect Ahern from EquipmentShare's conspiracy and seeks to prevent EquipmentShare and former employees from continuing their illicit scheme.

7.      Upon information and belief, after Ahern acted to hold EquipmentShare and Ahern's former employees accountable for their improper conduct, EquipmentShare partnered with EZ in order for EquipmentShare to continue its efforts to improperly steal Ahern's share of the equipment rental market.

8.      As stated on its website, "Equipment Zone, LLC was formed to assist owners of rental equipment and assets to maximize their potential rental prospects through a managed cooperative type rental platform."  *See Business Overview*, Ezequipmentzone.com, https://ezequipmentzone.com (last visited Sept. 20, 2020).

---

[1] The cases consolidated in the MDL are identified in Exhibit 1.
[2] The state court actions not a part of the MDL are identified in Exhibit 2.

9.      Upon information and belief, EquipmentShare provided the illegally-obtained confidential, proprietary, and/or trade secret information from Ahern to EZ to achieve, by indirect means, the very same illegal and illicit goals for which Ahern has sued EquipmentShare directly in the MDL and other state-court actions.

**PARTIES, JURISDICTION, AND VENUE**

10.      Ahern's principal place of business is in Las Vegas, Nevada, and is duly formed and existing under the laws of the State of Nevada.

11.      Upon information and belief, Defendant EquipmentShare is a Delaware corporation, with its principal place of business in Missouri.

12.      Upon information and belief, Defendant EZ is a Missouri limited liability company with its principal place of business in Missouri.  The citizenship of the members who comprise EZ are unknown but are believed to be residents of Missouri.

13.      The causes of action in this Complaint arise under trade secret laws of the United States, as well as the misappropriation of trade secrets and computer data tampering laws of the State of Missouri and tort common laws of the State of Missouri.

14.      This Court has federal question jurisdiction over the causes of action arising under the laws of the United States pursuant to 28 U.S.C. § 1331 and has supplemental jurisdiction over the remaining causes of action pursuant to 28 U.S.C. § 1367.

15.      This Court further has diversity jurisdiction over all causes of action pursuant to 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states[3] and the amount in controversy exceeds $75,000.00.

---

[3] Upon information and belief, Defendant EZ is a citizen of the State of Missouri.  However, in the context of diversity jurisdiction, a limited liability company's citizenship is determined by the citizenship of its members.  *See Lee v. Airgas - Mid S., Inc.*, 793 F.3d 894, 897 (8th Cir. 2015) ("[A]n LLC's citizenship is that of its members for diversity

16.     This Court has general personal jurisdiction over Defendant EquipmentShare because it is a citizen of Missouri since its principal place of business lies in Missouri.  Defendant EZ is subject to general personal jurisdiction in this Court because it is a citizen of Missouri, formed under the laws of the State of Missouri and with its principal place of business in Missouri.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because Defendant EZ is a resident of the State of Missouri and transacts its affairs within this judicial district.  Defendant EquipmentShare is also a resident of the State of Missouri and, upon information and belief, a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS

### A.     Ahern's Protection of its Confidential/Proprietary Information

18.     Ahern operates in the highly-competitive, multibillion-dollar equipment rental industry.  Due to the industry's evolution and like many other leaders in the equipment rental industry, Ahern recently began requiring employees to sign non-disclosure, non-solicitation, and non-competition agreements as a condition of employment.

19.     When employees begin with Ahern, they are required to execute various new hire forms, including a document entitled "Receipt of Employee Handbook and Acknowledgement of At-Will Employment."

20.     The Employee Handbook requires employees to safeguard confidential information and refrain from using confidential information outside the scope of their employment (the "Confidentiality Provision").  The Confidentiality Provision provides, "[e]ach employee is

---

jurisdiction purposes."").  The citizenship of EZ's members is not publicly available and is currently unknown.  Upon information and belief, Dwight McMinn, who is identified as the organizer of the entity but also believed to be a member, is a citizen of Missouri.

responsible for safeguarding and avoiding the use of confidential information obtained during employment with the Company [Ahern] and thereafter in perpetuity.  All employees, including past, present, and future, have the responsibility to prevent revealing, divulging and/or using any such information unless it is necessary to perform expressed job duties."

21.     The Confidentiality Provision defines "confidential information" as "confidential techniques, business strategies and plans, methods, processes, formulae, compositions, systems, inventions, machines, computer programs, research projects, actual and prospective customer lists, addresses and personal information, vendor lists, pricing data including rate structures, sales information, sources of supply, financial data and marketing, production or merchandising systems or plans, training materials and information, and Company procedures and policies."

22.     Pursuant to the Confidentiality Provision, an Ahern employee's "duty to safeguard the confidential information shall exceed [the employee's] period of employment in perpetuity."

23.     The Confidentiality Provision restricts access to confidential information.  The Confidentiality Provision provides, "[c]onfidential information is maintained on a need-to-know basis and must be authorized by your manager before you are permitted access."

24.     Ahern also required incoming employees to sign a "Disclosure and Indemnification Agreement" that, among other things, precluded those employees from disclosing to Ahern trade secrets, confidential information, or proprietary information of the employee's prior employer.

25.     Ahern employees are required to execute a "Confidentiality and Invention Assignment Agreement" (the "Confidentiality Agreement").  The Confidentiality Agreement broadly defines "Confidential Information" to include Ahern's "trade secrets, customer lists, customer purchasing histories and plans, costs, budgets, policies, procedures, processes, methods of operations, pricing, marketing plans, financial information, personnel information,

6

compensation programs, vendor sources, vendor identities and capabilities, research, machine and component histories, engineering data, designs and drawings, design standards, formulas, computer software and programs, Inventions . . ., and other data as well as information which Company receives from a third party and holds in confidence."  By executing the Confidentiality Agreement, Ahern employees agree that "I shall not at any time during my employment with Company or at any time thereafter, directly or indirectly disclose to any person or entity or use any Confidential Information except in the normal course of my duties as an employee of Company," among other terms.

26.     The Confidentiality Agreement also contains a remedies provision, which states in relevant part:

> Irreparable damage shall result to Company in the event of the breach by me of this Agreement.  In the event of a breach or threatened breach by me, Company shall be entitled to all remedies, including money damages, as well as injunctive relief and such other equitable relief to prevent or restrain any breach or threatened breach of this Agreement.  Each remedy of Company shall be cumulative and not in limitation of any injunctive relief or other rights or remedies which Company is or may be entitled at law or in equity.  Company shall be entitled to its reasonable attorney's fees, expert witness fees, and other expenses and costs it incurs in enforcing this Agreement or pursuing damages for my breach of this agreement.

27.     Ahern also utilizes a "Blogging and Social Network Policy" which concerns communications about Ahern's business outside of Ahern's internal network.  It prohibits the dissemination of certain information outside of the company.  Among other things, the Blogging and Social Network Policy provides that employees "must not breach the law, violate individual rights, or disclose or otherwise publish trade secrets, proprietary information, or confidential material.  Nor shall they breach or infringe upon Ahern's trademarks, copyrights, or other intellectual property, defame or in any way harm or negatively affect Ahern, its affiliates, related

entities, their respective employees (current or former), suppliers, vendors, advisors, customers and/or anyone associated with and/or otherwise doing business with Ahern."

28.     All Ahern employees are required to acknowledge and agree to a Security Access User Responsibility Acknowledgement and Agreement (the "Security Access Agreement").  The Security Access Agreement provides that employees who are entrusted with certain passwords and security access codes used to access, view, and/or transfer confidential information "may not, and will not, use such Security Access or Information for any purpose outside of performing your bona fide job duties," among other prohibitions.

29.     Ahern employees are required to acknowledge and agree to the terms of an Email/ Systems Misuse Agreement (the "Email Misuse Agreement").  The Email Misuse Agreement allows Ahern to protect its confidential information by limiting use of Ahern's email systems to Ahern business only, among other things.  By executing the Email Misuse Agreement, Ahern employees agree to the following, among other things:  "You may be given internet and e-mail access to assist you in the completion of your job duties.  Keep in mind that these systems are business tools and you are expected to use them for legitimate business purposes for the benefit of the Company. . . . Company equipment (including computers equipped for internet access), e-mail and voicemail systems are to be used for Company business only."

30.     Ahern employees execute a "Code of Conduct."  Among many other things, the Code of Conduct states that "theft, destruction, damage, or unauthorized removal or use of Company property or materials, including documents, records, data, computer programs, training materials and other proprietary information and materials" is prohibited and is grounds for discipline including immediate termination.

31.     The Code of Conduct also prohibits (and subjects employees to discipline for) the failure or refusal to follow general policies, rules and regulations of the Company and disclosing or discussing company or customer confidential matters to outsiders.

32.     Depending on their start date with the company, not necessarily every Ahern employee signed each of the foregoing documents (the Receipt of Employee Handbook and Acknowledgement of At-Will Employment, the Confidentiality Agreement, the Blogging and Social Network Policy, the Security Access Agreement, the Email Misuse Agreement, and the Code of Conduct).  Most employees, however, signed nearly all or all of the foregoing agreements.

33.     Ahern employees have varying levels of access to a computerized system referred to as "AS400", also known as "RentalMan."  The AS400 system, which is housed on servers in Nevada, includes a system where certain employees clock in and out, and holds customer lists and related rental/purchase data, employee data (including salary information), and pricing information, among other things.

**B.      EquipmentShare's Recent Business History**

34.     Upon information and belief, EquipmentShare was formed in November 2014 by brothers Willy and Jabbok Schlacks.  EquipmentShare's business model, upon information and belief, initially concerned the use of the so-called ES Track telematics system (hereinafter "ES Track") to track construction fleets and to gather information about the location and status of equipment in real time.  Further, upon information and belief, EquipmentShare would use the telematics system to track and share equipment and become (as reported by certain media outlets) the "Airbnb of construction."

35.     Upon information and belief, despite an influx of capital from various sources, as reported in the media, EquipmentShare's initial business model was unsuccessful.  Accordingly,

EquipmentShare apparently decided to refocus its business on regional brick-and-mortar equipment rental locations sometime in 2016 or 2017.

36.     Additionally, upon information and belief, EquipmentShare was and remains under pressure from its investors and/or lenders to rapidly grow and generate revenues and profits and become economically sustainable before EquipmentShare's seed money is depleted.

37.     As described more fully below, rather than build its operations organically, EquipmentShare engaged in a concerted plan to build brick-and-mortar locations through tortious actions targeting Ahern and its employees, who possess decades of combined experience in the marketplace.  EquipmentShare has grown from zero physical locations to 35 or more physical locations in under five years and now claims to have 1,300-plus employees.

38.     Upon information and belief, EquipmentShare apparently intends to continue opening physical locations in the future.

**C.     EquipmentShare's Conspiracy to Destroy Ahern**

39.     While Ahern was unaware of it at the time, sometime in or around early- to mid-2017, EquipmentShare began a concerted enterprise designed to destroy Ahern and to capture market share by systematically looting Ahern's employees and Ahern's confidential, proprietary, and/or trade secret information.

40.     Specifically, EquipmentShare engaged in a concerted campaign of false representations regarding Ahern and the state of its business.  In conjunction with this false campaign, EquipmentShare offered to pay Ahern employees more in salary than they earned with Ahern, in some instances, dramatically more than market/industry standards, which artificially inflates expenses in the industry.

41.     EquipmentShare did not merely lure Ahern's employees away using the foregoing tactics.  Upon information and belief, EquipmentShare directed outgoing Ahern employees to steal Ahern's confidential, proprietary, and/or trade secret information immediately before they left Ahern to begin working for EquipmentShare.  Ahern subsequently learned that, in numerous instances, immediately before leaving Ahern and joining EquipmentShare, employees secretly and improperly emailed to themselves copies of customer lists, equipment rental rates, master key account information, account information, customer price sheets and other pricing information, customer credit applications, national account information, and central regional account information, among other things, which were all confidential.

42.     In at least one instance, an Ahern employee, immediately before leaving Ahern and joining EquipmentShare, took steps to actively sabotage Ahern's business with its customers through lies and deception.

43.     EquipmentShare targeted a large number of Ahern sales representatives as part of its conspiracy, and did so at least in part because, unlike common industry practice, Ahern's sales representatives are account based, meaning they are tied to clients.  Sales representatives are not tied to geographic regions or territories.  As a result, EquipmentShare's poaching of Ahern's sales representatives has effectively caused large numbers of Ahern clients to follow their sales representative contacts to EquipmentShare.

44.     Ahern employees who left for EquipmentShare caused Ahern customers to leave Ahern for EquipmentShare.  Ahern's loss of customers and customer relationships built over decades has cost Ahern tens of millions of dollars in lost revenues.

45.     Because Ahern is private and family-owned, EquipmentShare's noncompetitive behavior is particularly damaging.  Unlike other competitors in the industry, Ahern cannot raise

capital through public markets.   Accordingly, EquipmentShare's noncompetitive behavior as described herein, which is intended to reduce Ahern's revenues while increasing its expenses, reflects a plan to destroy Ahern.

46.     Ahern instituted civil actions against numerous former employees, as well as EquipmentShare, in various jurisdictions throughout the country, for the express purpose of preventing EquipmentShare or Ahern's former employees from continuing their illicit conspiracy.

47.     To date, Ahern believes in excess of 100 (and perhaps more than 250 or 300) of its approximately 3,000 employees left to become employees of EquipmentShare as a result of EquipmentShare's conspiracy and scheme.

48.     While it is unknown exactly when EquipmentShare became knowledgeable of the agreements executed between Ahern and its employees, it is clear that EquipmentShare knew about the agreements, but continued its conspiracy against Ahern despite that knowledge.   On January 17, 2019, counsel for Ahern sent letters to Jabbok Schlacks, EquipmentShare's Chief Executive Officer, as well as numerous former Ahern employees.   In the letter to Schlacks, counsel for Ahern described EquipmentShare's unfair competition, mass departures of employees and customers from Ahern to EquipmentShare, and the resulting breaches of the employees' respective employment agreements with Ahern.   Ahern demanded that EquipmentShare take immediate measures to prevent former Ahern employees, or those at EquipmentShare's direction, from continuing these unlawful activities.

49.     EquipmentShare, nonetheless, continued to encourage, demand, or require former Ahern employees to violate their agreements with Ahern through the pattern and practice of misconduct described herein.

**D.      Examples of EquipmentShare's Misconduct throughout the Country**

50.      Upon information and belief, EquipmentShare took Ahern's confidential, proprietary, and/or trade secret information by influencing a number of employees to take such information prior to, and in some cases after, ending employment with Ahern.  These acts clearly violated the employees' agreements with Ahern and were done without authorization by Ahern.  Furthermore, there can be no reasonable grounds for the employees to believe they had such authorization to access and distribute Ahern's confidential, proprietary, and/or trade secret information.

**I.      EquipmentShare's Misconduct in Texas**

51.      For example, Keith Menges worked for Ahern for approximately five years in San Antonio, Texas until he suddenly resigned from Ahern on December 28, 2017.  EquipmentShare then began employing Menges.  At various points during his employment at Ahern, Menges executed the Receipt of Employee Handbook and Acknowledgement of At-Will Employment, the Email Misuse Agreement, the Code of Conduct, the Blogging and Social Network Policy, and the Security Access Agreement.  Before Menges began working for EquipmentShare, Menges emailed Ahern's confidential master key account information from his Ahern email address to his personal email address on at least three occasions.  On December 20, 2017, one week before Menges resigned, he sent the master key account information to his personal email address a final time.

52.      The master key account information contains confidential, proprietary, and/or trade secret information about Ahern's customers that gives Ahern a competitive advantage, including names of the key decision-makers working for customers, what customers may be interested in buying, customers' future plans, and personal information about the decision-makers at or owners of customers such as the names of their children, wives, or key subordinates.  The master key

account information also reveals how much revenue is generated from each customer over intervals of 90, 180, and 270 days as well as the revenue generated from the customer the prior year.

53.     Upon information and belief, despite Ahern's demand that EquipmentShare and Menges cease and desist use of Ahern's confidential, proprietary, and/or trade secret information, both EquipmentShare and Menges continue to do so.

54.     In addition to Menges, EquipmentShare hired at least nine Ahern employees from its San Antonio, Texas location, including multiple branch managers, sales representatives, and other employees.  A former Ahern branch manager who left for EquipmentShare made numerous false representations about Ahern to Ahern employees, including that Ahern was selling its business to another rental company, among other misconduct.

55.     As another example, in February 2017, Ahern hired Chad Haag as a sales representative at its McKinney, Texas branch.  Upon starting employment at Ahern, Haag executed the Receipt of Employee Handbook and Acknowledgement of At-Will Employment, the Security Access Agreement, the Email Misuse Agreement, the Code of Conduct, the Blogging and Social Network Policy, and the Confidentiality Agreement, among other things.

56.     Ahern employed Haag until Haag resigned in late 2017, when he went to work for EquipmentShare.  Before Haag resigned from Ahern and began working for EquipmentShare, Haag emailed Ahern's confidential information from his Ahern email address to his personal email address.  Haag emailed Ahern's confidential information to his personal email address on at least seven occasions.  On August 23, 2017, Haag emailed the master national customer list and central regional account list to his personal email account.  Ahern's account lists contain information on individual customers, their addresses, and the revenue generated by each customer over the past

several years.  On September 3, 2017, Haag emailed additional customer information, including contact information, to his personal email account.  While Ahern employed Haag, Haag also secretly sent Ahern's confidential price sheets for at least fifteen customers, customer credit applications, and internal forms to his personal account.

57.     Upon information and belief, despite Ahern's demand that EquipmentShare and Haag cease and desist, EquipmentShare and Haag continue to use Ahern's confidential, proprietary, and/or trade secret information.

58.     In addition to Haag, EquipmentShare hired at least four additional Ahern employees from Ahern's McKinney, Texas location, including two additional sales representatives.

59.     EquipmentShare's misconduct and conspiracy played out repeatedly in Texas.  For example, in Corpus Christi, Texas, EquipmentShare hired from Ahern:  a branch manager, a sales/branch manager, multiple sales representatives, and multiple mechanics, among others. Former branch manager Dale Lawrence stated that he was going to "crush" Ahern's local branch.

60.     In September 2018, Lawrence, while he was still the branch manager for Ahern's Corpus Christi location, approached at least two Ahern employees, including a counter dispatcher, to inquire if they would leave Ahern to work for EquipmentShare.  Lawrence asked the Ahern employees to stay with Ahern while he set up EquipmentShare's new location and took all of Ahern's customers, after which Lawrence stated that he would hire them to work for EquipmentShare.  Lawrence used knowledge about Ahern's employees' pay to offer positions at a higher rate of pay with EquipmentShare to induce the employees to leave Ahern.

61.     On another occasion, former Ahern employee Seth Taylor texted the Ahern dispatcher asking for the phone number of an Ahern customer that he had not serviced while at

15

Ahern.  Ahern also learned that Taylor had linked his cell phone to his personal iPad so that he could access the Ahern AS400 system after he left Ahern.  Taylor also told another Ahern employee he used a chip to download all the data from his Ahern work cellphone, including customer names, contact information, and pricing information, and stated he would take all of the customers with him to EquipmentShare, causing Ahern to "shut down."

62.     In Houston, Texas, EquipmentShare hired at least 14 different Ahern employees, including sales managers, sales representatives, mechanics, and operations/service employees, among others.  EquipmentShare's employees told Ahern employees that another rental company was going to buy EquipmentShare out and that EquipmentShare knew Ahern's pay scales. Customers reported to Ahern that EquipmentShare's goal was to drive rates down and force Ahern out of the Houston market.

63.     In Austin, Texas, EquipmentShare solicited at least 10 Ahern employees and hired at least nine former Ahern employees.  This includes multiple sales representatives and a branch manager, among others.

64.     In Irving, Texas, EquipmentShare hired at least 11 Ahern employees, including multiple branch managers, mechanics, and at least one sales representative.

**II.     EquipmentShare's Misconduct in California**

65.     Ahern employed Matthew Allen as a sales representative in Sacramento, California beginning in or about June 2002.  Upon starting employment at Ahern or thereafter, Allen executed an early version of the Email Misuse Agreement, the Receipt of Employee Handbook and Acknowledgement of At-Will Employment, and the Blogging and Social Network Policy, among other things.

66.     In June 2019, after Allen began working for EquipmentShare, he contacted at least one other Ahern employee, an outside sales representative, and made scurrilous allegations about the Ahern employee's commissions, alleging that Ahern was "screwing" the employee out of commissions with a specific customer.   These allegations were made in an attempt to lure the employee to come work for EquipmentShare.   Allen also referenced sensitive and proprietary internal practices of Ahern as he attempted to lure Ahern employees to EquipmentShare.   These practices included details of confidential compensation programs that Allen learned of during his time at Ahern.   Allen used the compensation program information of Ahern to lure Ahern's employees to EquipmentShare for more pay.

67.     Ahern employed Derrick Torres as a branch manager in Fremont, California.   Upon starting employment at Ahern or thereafter, Torres executed the Receipt of Employee Handbook and Acknowledgement of At-Will Employment, the Blogging and Social Network Policy, the Code of Conduct, the Email Misuse Agreement, and the Security Access Agreement, among other things.   Ahern employed Torres until he resigned on January 25, 2016, and began working for EquipmentShare.

68.     Not even one hour before he resigned, Torres sent Ahern's confidential, proprietary, and/or trade secret information from his Ahern email account to his personal email account.   This included a document detailing Ahern's branch manager functions and structure, duties and responsibilities, expectations, goals, organizational relationships, qualifications and demands, as well as compensation structure – essentially the roadmap of Ahern's branch operations.   Torres also misappropriated Ahern assets and violated company policies in the timeframe before his departure from Ahern, including writing contracts to himself as the customer

for free and heavily discounted use of Ahern equipment, apparently to gain favor with customers before his move to EquipmentShare.

69.    As employees of EquipmentShare, Torres and Allen targeted and continue to target Ahern employees by personally contacting Ahern employees and asking the employees to leave Ahern for EquipmentShare.  Upon information and belief, EquipmentShare, Torres, and Allen used and continue to use Ahern's confidential personnel information, which Torres and Allen learned while Ahern employed them, to target Ahern employees.

70.    Upon information and belief, despite Ahern's demand that EquipmentShare, Torres, and Allen cease and desist use of Ahern's confidential, proprietary, and/or trade secret information, they have failed to do so.

71.    EquipmentShare has, and continues to, solicit additional Ahern employees as EquipmentShare seeks to establish bases of operations in California.  EquipmentShare hired at least one sales representative from Ahern's Bakersfield, La Mirada, Sacramento, and Modesto branches, and hired other Ahern employees from its Bakersfield, Bloomington, Irwindale, Romoland, San Francisco, San Leandro, Santa Ana, and Ventura locations.

72.    EquipmentShare also solicited and attempted to recruit M. Elliot Vigil, Ahern's top grossing sales representative in Colorado, beginning in or around March or April 2019.  Jabbok Schlacks, on at least one occasion, directly solicited and recruited Vigil to EquipmentShare.

**III.    EquipmentShare's Misconduct in Utah**

73.    EquipmentShare improperly acquired confidential, proprietary, and trade secret information from Ahern's former employee in Utah, who secretly emailed Ahern's confidential information to her personal email address.

74.     On or about August 3, 2010, Ahern hired Michelle McCormac as a sales representative in Utah.  As a sales representative, McCormac was the face of Ahern to current and prospective Ahern customers.  Upon starting her employment at Ahern, McCormac acknowledged that she read, understood, and agreed to comply with the terms of the Employee Handbook, including the Confidentiality Provision.  In addition to agreeing to the Confidentiality Provision, at various dates McCormac also agreed to the Email Misuse Agreement, the Code of Conduct, and the Blogging and Social Network Policy.  Ahern employed McCormac for over nine years. Throughout those nine years, McCormac could access confidential, proprietary, and/or trade secret information about Ahern's business, customers, employees, business plans and strategies, actual and prospective customer lists, vendor lists, and pricing and sales data, among other things.

75.     On September 27, 2019, McCormac resigned from her position at Ahern.  Before resigning, McCormac emailed Ahern's confidential, proprietary, and/or trade secret information from her Ahern email address to her personal email address.  On September 9, 2019, McCormac sent confidential equipment rental rates to her personal email address.  On September 23, 2019, McCormac emailed a confidential customer list – containing information on 3,000 Ahern customers – to her personal email address.  The customer list contained confidential information, such as the personal home addresses of decision-makers who worked for customers.  One day before resigning, McCormac emailed confidential equipment rental rates to her personal email address again.  McCormac also emailed a link to Ahern's sales representative compensation plan for 2019-2020 to herself, among other documents, before departing Ahern.

76.     Once McCormac resigned from Ahern, EquipmentShare began employing McCormac in a substantially similar position to the position that McCormac held at Ahern.

77.     Upon information and belief, EquipmentShare and McCormac used and continue to use Ahern's confidential equipment rental rates and customer list.  Upon information and belief, despite Ahern's demand that EquipmentShare and McCormac cease and desist use of Ahern's confidential, proprietary, and/or trade secret information, they have failed to do so.

### IV.     EquipmentShare's Misconduct in Arizona

78.     EquipmentShare's pattern and practice of improperly targeting Ahern employees through defamatory innuendo, increased compensation, theft of proprietary, confidential, and trade secret information by outgoing Ahern employees and exploitation of that information after the employees joined EquipmentShare, formation or growth of EquipmentShare's brick-and-mortar locations, often very near competing Ahern locations, and the resulting destruction of Ahern locations has repeated itself across the country.

79.     In places, EquipmentShare's conspiracy gutted particular Ahern locations of large numbers of individuals based on the same types of lies, distortions, uncompetitive behavior, and bad acts described above.

80.     For example, to establish a Phoenix, Arizona location, EquipmentShare hired a mechanic from Ahern's Phoenix location, a sales representative from Ahern's Phoenix location, and a sales manager from Ahern's Odessa, Texas location.  These three former employees then solicited at least nineteen additional Ahern employees for EquipmentShare's Phoenix branch, including multiple sales representatives, drivers, and mechanics.  EquipmentShare built its Phoenix location based largely with poached Ahern employees.

81.     Through the improper acts of a former Ahern mechanic, who became the General Manager of EquipmentShare's Phoenix location, EquipmentShare systematically raided Ahern's

employees and offered them higher compensation than the compensation they were earning at Ahern.

82.     Ahern hired Deral Bonner on or around October 16, 2016 as a Service Manager in Arizona.   As Service Manager, Bonner had access to the performance and compensation of everyone in the service department, including service technicians and mechanics.  In or around late September or early October of 2019, Bonner requested to move from the Service Manager position at Ahern to a Mechanic position.  As a result of this request, he relocated where he worked and had direct and consistent contact with Ahern's mechanics and service technicians throughout the day.

83.     Bonner received an offer to become General Manager of EquipmentShare in or around the first week of October 2019.  Bonner accepted this offer and started working at EquipmentShare on October 16, 2019.  Bonner became a General Manager for EquipmentShare and was responsible for opening the Phoenix branch.  Once Bonner moved to EquipmentShare and opened the Phoenix branch, he systematically raided Ahern's employees and offered them higher compensation, using his knowledge of Ahern's compensation structure.

84.     Under oath, Bonner admitted he targeted and hired from Ahern nineteen of the approximate twenty-five EquipmentShare employees at the Phoenix branch.  Bonner also admitted under oath he directly negotiated the pay of the mechanics he hired at EquipmentShare.  Barring one possible exception, Bonner stated under oath he hired each of these former Ahern employees at a higher salary than what he knew they were paid at Ahern.

85.     Further, EquipmentShare improperly acquired and used confidential, proprietary, and/or trade secret information from a former sales representative of Ahern in Phoenix, Arizona,

who secretly emailed such information belonging to Ahern to her personal email address, as well as targeted and acquired numerous Ahern customers.

86.     On or about March 1, 2018, Ahern hired Christina Gutierrez as a sales representative in Arizona.  Upon starting her employment at Ahern, Gutierrez entered into a Confidentiality and Invention Assignment Agreement with Ahern on February 19, 2018.  This Agreement included non-disclosure obligations.  Throughout her employment, Gutierrez could access confidential, proprietary, and/or trade secret information about Ahern's business, customers, employees, business plans and strategies, actual and prospective customer lists, vendor lists, and pricing and sales data, among other things.

87.     Gutierrez resigned her employment with Ahern on or about November 8, 2019, at which point she went to work for EquipmentShare in a substantially similar role.  Prior to her departure from Ahern, Gutierrez engaged in suspicious activity, such as sending a November 6, 2019 email communication to a client and copying her personal email account.  Gutierrez also printed multiple charts containing client payment and commission details in late October 2019.  Before returning her Ahern mobile phone, Gutierrez wiped the phone.

88.     By December 2019, Ahern had received calls from three clients who stated that Gutierrez had contacted them to solicit their business.  Under oath, Gutierrez admitted to contacting nearly all her Ahern customers and admitted to targeting and acquiring approximately fifteen of her twenty-seven current customers at EquipmentShare from Ahern.  Gutierrez also stated under oath she believed all the customers she took from Ahern with her to EquipmentShare were given reduced rates as compared to the rates these customers paid at Ahern.

89.     Upon information and belief, EquipmentShare and Gutierrez improperly used and continue to use Ahern's confidential equipment rental rates and customer list.  Upon information

22

and belief, despite Ahern's demand that EquipmentShare and Gutierrez cease and desist use of Ahern's confidential, proprietary, and/or trade secret information, they have failed to do so.

90.     EquipmentShare hired at least nine Ahern employees, including one or more branch manager, service manager, mechanic, at least four sales representatives, and a driver to build its Lake Charles, Louisiana branch.

### V.     Additional Examples of EquipmentShare's Misconduct

91.     Upon information and belief, EquipmentShare solicited confidential, proprietary, and/or trade secret information from Ahern's former employee in South Carolina who, while still employed by Ahern, secretly worked with EquipmentShare to open a competing location less than two miles from an existing Ahern location.  EquipmentShare's illicit and illegal acts in South Carolina provide yet another example of EquipmentShare's conspiracy against Ahern alleged herein.

92.     In Oklahoma City, Oklahoma, EquipmentShare's new branch was formed and developed based on EquipmentShare's hiring of at least seven Ahern employees, including its branch manager, sales manager, service manager, multiple sales representatives, and several other employees.  In one or more instance, the Ahern employees hired to work for EquipmentShare were told that Ahern's branch was going to close down and that Ahern was not making enough money.

93.     Ahern, as noted above, has its principle place of business and is headquartered in Las Vegas, Nevada.  EquipmentShare attempted to hire, or actually hired, Nevada-based employees of Ahern in multiple instances, from both its corporate office and its local branches.

94.     In a separate instance, EquipmentShare poached Ahern's consultant who was tasked with finding properties for Ahern pursuant to an exclusive consulting agreement.  Despite a contractual provision whereby the consultant agreed not to take on any business activities, paid

23

or unpaid, for a third party during the term of the contract without authorization from Don Ahern, upon information and belief, the consultant is now performing the exact same role for EquipmentShare.  Ahern has sent letters to the consultant, and later to EquipmentShare, concerning the consultant's breach of the agreement and EquipmentShare's interference with the contract.  Despite this, upon information and belief the consultant continues to perform work for EquipmentShare.

95.     In addition to the instances described above, EquipmentShare also solicited and hired Ahern employees in Washington, Florida, Georgia, Kansas, Maryland, New York, North Carolina, and Oregon.  In over two years, EquipmentShare created dozens of brick-and-mortar locations exploiting Ahern's decades of experience and institutional knowledge, all through the conspiracy described above.

**E.     EquipmentShare's Use of Missouri Residents to Further Conspiracy against Ahern**

96.     Two former Ahern employees, Keith Wade and Jessie Wade who reside in Missouri, repeatedly solicited and attempted to lure Ahern's Chief Development Officer, Cory Rosencranse, to EquipmentShare in November and December of 2019.

97.     Keith and Jessie Wade are husband and wife.  Jessie Wade had been Ahern's Vice President of Finance until she took a similar role for EquipmentShare in or about June 2019.  While still with Ahern, both Keith Wade and Jessie Wade executed Employment Agreements that contain non-solicitation and non-disparagement provisions.  Pursuant to the non-solicitation provision, the Wades agreed not to solicit or attempt to hire Ahern employees, among other things.  The obligations in the non-solicitation provision continue for two years following the end of employment with Ahern.  The Wades' non-solicitation agreements will remain in effect through mid- to late-2021.

98.     On a November 5, 2019 call, Keith Wade contacted Rosencranse and asked how he was doing, if Rosencranse was happy at Ahern, and stated that he was not calling to solicit Rosencranse.   Wade then asked if Rosencranse signed the "Work Agreement" that Ahern introduced to employees in the summer of 2019.   The "Work Agreement" contained a noncompetition clause.  Rosencranse told Wade that he signed the "Work Agreement."  The Wades informed Rosencranse that they relocated to Missouri, were working for EquipmentShare, and were very happy there.

99.     Subsequently, on November 27, 2019 at approximately 12:40 P.M., Rosencranse returned a call from Keith Wade.  During this call, Wade told Rosencranse that Jabbok Schlacks would love to meet with Rosencranse.   Wade then indicated that he heard that Ahern recently opened a data center, and that Don Ahern was actively looking to sell the company possibly due to complications with his health or for some type of end game.  Wade's actions, undertaken at the behest of EquipmentShare, blatantly violated the non-solicitation clause in the Employment Agreement he executed with Ahern.

100.    Rosencranse then asked Wade if Jabbok Schlacks was aware that Rosencranse had signed the "Work Agreement" with Ahern that contained a noncompetition provision.   Wade responded that Schlacks knew that Rosencranse had signed the non-competition agreement and they had a plan to work around it.   Wade stated that Schlacks would move Rosencranse to Australia, where he would spend one year in a role setting up rental store locations in Australia and possibly New Zealand.   Wade stated that it could be an adventure, and that after one year, Rosencranse could stay in Australia if he chose to or come back to the United States to continue working.

101.    During the same call, Wade stated there is not a "bright future" at Ahern and again claimed that Don Ahern was actively intending to sell the company.  Wade claimed that Jabbok Schlacks had confirmed with an independent third party that Don Ahern actively intended to sell the company.  Wade stated that this was not a surprise because Don Ahern's health was poor and that he has no succession plan.  Wade then stated that he was not sure if Ahern could pull off a sale because of Don Ahern's questionable decisions.

102.    On December 9, 2019, Rosencranse met with Jabbok Schlacks in Missouri as EquipmentShare continued to solicit Rosencranse, notwithstanding its knowledge of his non-competition agreement with Ahern.  Keith Wade set up this meeting and encouraged Rosencranse to attend it in violation of his non-solicitation agreement with Ahern.

103.    During the December 9, 2019 meeting, Rosencranse described the Work Agreement, including the non-competition provision, to Schlacks.  Schlacks opined that the noncompetition provision was unenforceable and that EquipmentShare would "go to the ends of the earth" to fight legal action taken to enforce it.  Schlacks stated that EquipmentShare would spend $10 to $15 million on legal fees to defend Rosencranse.  Schlacks compared the non-competition clause to slavery, stated that non-competition agreements were not enforceable unless a person was the "actual CEO", and stated that he might file a federal anti-trust lawsuit against the industry for using such provisions.

**F.    EquipmentShare Partnered with EZ to Continue Its Illegal and Illicit Activities**

104.    Upon information and belief, due to the numerous lawsuits filed by Ahern against EquipmentShare in order to stop EquipmentShare's illegal and illicit activities and the resulting harm to Ahern, EquipmentShare has contracted with EZ to use Ahern's confidential, proprietary, and/or trade secret information to continue the illegal attack upon Ahern's business.  Specifically,

Ahern is involved in no less than twenty-one federal and state lawsuits related to EquipmentShare's improper soliciting of Ahern's employees and customers and stealing of Ahern's confidential, proprietary, and/or trade secret information.  *See* Exhibits 1, 2.

105.    Upon information and belief, in an apparent attempt to realize its original goal of becoming the "Airbnb" of the equipment rental industry, EquipmentShare has sought out and conspired with EZ to use Ahern's confidential, proprietary, and/or trade secret information to continue the illegal attack upon Ahern.

106.    As discussed above, EZ is a limited liability company that was formed under the laws of the State of Missouri.  According to its Articles of Organization, Dwight McMinn organized the entity on April 5, 2018.  EZ provides a managed cooperative type rental platform to assist owners of rental equipment to rent the equipment they own.

107.    The software EZ uses to assist owners with renting their equipment is owned, operated, and managed by EquipmentShare.

108.    Even a cursory review of EZ's website reveals a substantial relationship between EquipmentShare and EZ.  For example, the "ES" logo is present throughout EZ's website.  The "ES" logo appears on the "EZ Credit App[lication]," and appears prominently in a video embedded on the Frequently Asked Questions page of the Company's website.  *See* Exhibit 4, EZ Equipment Finance Application; and Exhibit 5, FAQ, EZ Equipment Zone.

109.    The aforementioned video appears underneath the heading of "How to Track Your Machine," and displays a web address to EquipmentShare's website.  *See* Exhibit 5; *see also Frequently Asked Questions*, https://ezequipmentzone.com/faq (last visited Sept. 20, 2020) (depicting the ES Track application, with a web address of "EquipmentShare.com/track").

110.    EquipmentShare's website also predominantly showcases the ES Track technology

for its customers to use. *See* Exhibit 6.

111.    EZ's website boasts users of ES Track "will be able to see the location, daily usage, and the movements of each piece of equipment, along with other data about the equipment." Exhibit 6. EquipmentShare's website also details ES Track's ability to locate equipment and drivers, provide usage reports, and monitor equipment attachments on the jobsite, among other equipment data metrics. Exhibit 6. In sum, both EquipmentShare and EZ utilize the same technology to perform the same work.

112.    In addition to EZ using ES Track to enable its equipment rental owners to track the usage and whereabouts of their equipment, the EZ website repeatedly refers to EZ's operations being facilitated by and through an agreement with a "national rental company." *See* Exhibit 3, at 1-3, and Exhibit 5, at 1-2; *see also Business Overview, supra.* Further, the Equipment Zone Asset Management Agreement provides that all rental equipment owners using the EZ platform must, in addition to using ES Track, use "ES Service." Exhibit 3, at 3. As stated in the Agreement, ES Service is the mechanism that EZ uses to maintain and service all equipment belonging to its rental owners. *See id.*

113.    Both EquipmentShare and EZ's websites link to credit applications that not only look similar, but also feature a similar black and orange ES logo, further evidencing the link between the two companies. *See* Exhibit 4 and Exhibit 7.

**G.      EquipmentShare and EZ's Exploitation of Ahern's Confidential/Proprietary Information**

114.    Upon information and belief, EZ is merely an extension of EquipmentShare's equipment rental operations.  EquipmentShare is using EZ to attempt to achieve its goal of destroying Ahern, by using EZ to continue to exploit the confidential, proprietary, and/or trade secret information EquipmentShare improperly obtained from Ahern and avoid the multiple lawsuits Ahern has asserted against EquipmentShare to defend Ahern's trade secrets.

115.    Upon information and belief, based on EquipmentShare's improper conduct as described above, EZ is exploiting Ahern's customer lists, rental information, pricing information, and marketing strategies in its selection, placement, monitoring, and service of the equipment belonging to rental owners.

116.    The Asset Management Agreement, to which rental owners participating in EZ's rental cooperative must agree, states the "EZ [] Asset Management Marketplace (the 'Marketplace') is a rental platform that enables [would-be owners] to acquire equipment assets [and] monetize [their] equipment through [EZ's] rental agreements with a national equipment rental company with numerous rental locations."  Exhibit 3, at 1.  In addition, the Asset Management Agreement repeatedly refers to its "Master Rental Agreement" with a "national equipment rental company" or "a nationally recognized equipment rental company," which facilitates, enables, and ensures that rental owners' equipment will be rented in "various markets and physical rental locations." Exhibit 3, at 2-3; *see also* Exhibit 5, at 1 ("[EZ] has a Master Rental Agreement with a national equipment rental company enabling us to place [equipment at] all of our available rental locations.").  The Marketplace lists and markets rental owners' equipment assets "to achieve the maximum prospective rental rates [and] as much utilization of the equipment as possible." Exhibit 3, at 2.  Rental owners have no choice but to participate in the Marketplace

and "to be bound by the terms of [short-term] rental contracts" that result from EZ's partnership with a national equipment rental company. *Id* at 2-3; *see also* Exhibit 8, How the Process Works, at #7 (EZ "will add [rental owners'] equipment into [its] Master Rental Program and be <u>advertised as available for rent through [EZ's] strategic rental agreement with a national equipment rental company and placed into specific markets to maximize the rental rates</u>.") (Emphasis added).

117.    Upon information and belief, EZ is using the confidential, proprietary, and/or trade secret information EquipmentShare illegally obtained from Ahern to place rental owners' equipment.

118.    Rental owners participating in the EZ rental cooperative are required to use "[EquipmentShare] ES Track," the monthly cost of which "will be deducted from the gross rental proceeds" of rental owners' equipment.  Exhibit 3, at 3.  Likewise, rental owners engaged in the EZ rental cooperative must use "[EquipmentShare] ES Service" to service and maintain their equipment. *Id.*

119.    Upon information and belief, EZ is using the confidential, proprietary, and/or trade secret information EquipmentShare illegally obtained from Ahern to monitor, service, and maintain rental owners' equipment.

120.    As described by FAQ #8 on EZ's website, rental owners participating in EZ's rental cooperative must "purchase [] equipment through [EZ and EquipmentShare's] strategic partnership."  Exhibit 5, at 2.  In other words, a would-be rental owner who desires to participate in EZ's rental cooperative cannot purchase his or her own rental equipment.  EZ's FAQs also state that it "will advise" would-be rental owners "on what equipment to purchase as we . . . know what equipment brings the best rental rates and has the most utilization for maximum profit."  *Id.* at 1.

EZ claims to have "a proven track record" of "good utilization rates" and "maximum rental rates." *Id.*

121.    Upon information and belief, EZ's selection of permissible rental equipment and its advice to would-be rental owners regarding the purchase of such equipment derives from the confidential, proprietary, and/or trade secret information EquipmentShare illegally obtained from Ahern.

122.    Upon information and belief, EZ also is relying on the confidential, proprietary, and/or trade secret information EquipmentShare illegally obtained from Ahern to develop profitable utilization and rental rates.  Given the nascent nature of EZ, Ahern is informed and believes that the "track record" and market information that EZ utilizes to guide would-be rental owners' purchase of such equipment is the confidential, proprietary, and/or trade secret information EquipmentShare illegally obtained from Ahern.

123.    Upon information and belief, EquipmentShare has provided the illegally-obtained confidential, proprietary, and/or trade secret information it stole from Ahern to EZ for the purpose of furthering the conspiracy to destroy Ahern's business.

124.    Upon information and belief, EZ has knowledge the confidential, proprietary, and/or trade secret information provided to it by EquipmentShare was illegally obtained by EquipmentShare from Ahern, yet EZ continues to benefit from such Ahern information.

125.    Upon information and belief, both EquipmentShare and EZ have specifically intended to utilize the confidential, proprietary, and/or trade secret information belonging to Ahern that was unlawfully obtained for the purpose of destroying Ahern and its business.

126.     Upon information and belief and with the opportunity to propound discovery, Ahern anticipates that EZ and EquipmentShare's exploitation of Ahern's confidential, proprietary, and/or trade secret information will further support Ahern's theories described in this Complaint.

## CLAIMS FOR RELIEF

### COUNT I
### AGAINST ALL DEFENDANTS
### Conspiracy under the Computer Fraud and Abuse Act

127.     Ahern incorporates by reference the allegations contained in the above paragraphs 1 through 126 of this Complaint.

128.     Upon information and belief, Defendants' conduct as alleged herein violates 18 U.S.C. § 1030(b) and 18 U.S.C. § 1030(a)(2).   Specifically, upon information and belief, Defendants EquipmentShare and EZ have agreed that one or both of them, or through third parties acting at their direction:   intentionally accessed Ahern's protected computer(s) without authorization or exceeding authorized access; thereby obtaining information from protected computers involved in interstate communication; which caused a loss to Ahern during a one-year period in excess of $5,000.

129.     Upon information and belief, EquipmentShare and EZ's conspiracy as alleged herein violates 18 U.S.C. § 1030(b) and 18 U.S.C. § 1030(a)(4).   Specifically, upon information and belief, Defendants EquipmentShare and EZ have agreed that one or both of themselves, or through third parties acting at their direction:   intentionally accessed a protected computer(s); did so without authorization or exceeding such authorization that was granted; did so knowingly and with intent to defraud; and thereby furthering the intended fraud and obtaining something of value, which caused a loss to Ahern during a one-year period in excess of $5,000.

130.    Upon information and belief, EquipmentShare and EZ's conspiracy as alleged herein violates 18 U.S.C. § 1030(a)(5).  Specifically, and as described in detail above, Defendants have agreed that one or both of themselves, or through third parties acting at their direction: knowingly caused the transmission of a program, information, code, or command, and as a result of such conduct, intentionally cause damage without authorization, to a protected computer; intentionally accessed a protected computer without authorization, and as a result of such conduct, recklessly cause damage; and/or intentionally accessed a protected computer without authorization, and as a result of such conduct, cause damage and loss.

131.    Pursuant to 18 U.S.C. § 1030(g), Ahern seeks an award of damages in an amount to be determined at trial resulting from Defendant's violations of 18 U.S.C. § 1030, or any other relief the Court deems appropriate.

**COUNT II**
**AGAINST ALL DEFENDANTS**
**Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836**

132.    Ahern incorporates by reference the allegations contained in the above paragraphs 1 through 126 of this Complaint.

133.    Ahern owns, possesses, and developed over the years certain nonpublic, confidential and proprietary information, including business contacts, financial records, customer lists, business plans and practices, marketing plans and practices, and other information related to its customers.

134.    Ahern has made a reasonable effort and took reasonable steps to keep the information secret, including by:  maintaining the information on a secure server requiring a username and password, by having its employees sign agreements to maintain the confidentiality of the information, by maintaining policies and procedures to ensure the confidentiality of the

information, by taking steps to determine whether breaches of the information occurred and respond accordingly, and by taking legal action where necessary to protect the information.

135.     This confidential and proprietary information involves and relates to customers and involves and relates to services intended to be used in interstate commerce.  Ahern's information constitutes trade secrets within the meaning of the federal Defend Trade Secrets Act, 18 U.S.C. §§ 1832, 1839.

136.     This information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

137.     In violation of Ahern's rights, Defendants have misappropriated and improperly disclosed the trade secret information by improper means, as alleged herein.  Defendants' misappropriation of the trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

138.     As the direct and proximate result of Defendants' conduct, Ahern has suffered and will continue to suffer injury and significant damages in an amount to be proven at trial, and is entitled to statutory exemplary damages and recovery of its attorneys' fees and costs.

**COUNT III**
**AGAINST ALL DEFENDANTS**
**Violation of the Missouri Uniform Trade Secrets Act, MO. REV. STAT. § 417.450 *et seq.***

139.     Ahern incorporates by reference the allegations contained in the above paragraphs 1 through 126 of this Complaint.

140.     Ahern's confidential and proprietary information, as described herein, derives substantial, independent economic value, actual or potential, from not being generally known to,

or ascertainable by proper means by, other persons who can obtain economic value from its disclosure, such as Ahern's competitors.

141.    Ahern has invested substantial time and resources and made reasonable efforts to maintain the secrecy of its confidential and proprietary information, including by requiring all employees who have access to such information to sign non-disclosure agreements, and by restricting access to such information.

142.    Ahern's confidential and proprietary information, as described herein, are trade secrets.

143.    Because of EquipmentShare's employees' former employment with Ahern, those employees had knowledge of and access to the confidential and proprietary trade secrets under circumstances giving rise to a duty to maintain their secrecy.

144.    EquipmentShare's employees have, without Ahern's express or implied consent, misappropriated Ahern's confidential and proprietary trade secrets.

145.    Upon information and belief, EquipmentShare directed Ahern's former employees who joined EquipmentShare to disclose Ahern's confidential and proprietary trade secrets without Ahern's express or implied consent.   These actions have been undertaken with reckless indifference to Ahern's rights.

146.    Upon information and belief, EquipmentShare has disclosed Ahern's confidential and proprietary trade secrets, without Ahern's expressed or implied consent, to EZ.  These actions have been undertaken with reckless indifference to Ahern's rights.

147.    Upon information and belief, EZ has acquired Ahern's confidential and proprietary trade secrets, which were obtained by improper means by EquipmentShare employees.

148.    Both EquipmentShare and EZ knew, or should have known, at the time they received Ahern's confidential and proprietary trade secrets that the trade secrets were improperly derived from or through Ahern's former employees, who owed a duty to Ahern to maintain the trade secrets' secrecy, yet nonetheless, utilized improper means to acquire the trade secrets.

149.    EquipmentShare and EZ's misappropriation and ongoing use of Ahern's confidential and proprietary trade secrets requires EquipmentShare and EZ return to Ahern all materials constituting, reflecting, or embodying such trade secrets.

150.    EquipmentShare and EZ's misappropriations and ongoing use of Ahern's confidential and proprietary trade secret information described herein is outrageous because of their evil motive and reckless indifference toward the rights of others, including Ahern.

151.    As a direct and proximate result of EquipmentShare and EZ's actions as described herein, Ahern has sustained and continues to suffer damage.

**COUNT IV**
**AGAINST ALL DEFENDANTS**
**Violation of Tampering with Computer Data and Equipment, MO. REV. STAT. § 537.525,**
**Regarding Violation of MO. REV. STAT. § 569.095**

152.    Ahern incorporates by reference the allegations contained in the above paragraphs 1 through 126 of this Complaint.

153.    Pursuant to MO. REV. STAT. § 537.525, Ahern has the right to bring a civil action against any and all persons who knowingly and without authorization, or without reasonable grounds to believe he or she has such authorization, tampers with computer data.

154.    Ahern's former employees, now employed by EquipmentShare, removed from Ahern's computer system confidential and proprietary trade secret information in violation of MO. REV. STAT. § 537.525.

155.    EquipmentShare knew Ahern's former employees knowingly and without authorization took data consisting of confidential and proprietary trade secrets belonging to Ahern and residing in Ahern's computer system, and unlawfully disclosed that information that was illegally obtained to EquipmentShare.

156.    Upon information and belief, Ahern's confidential and proprietary trade secrets were provided to EZ by EquipmentShare to further EquipmentShare's objective of destroying Ahern's business.

157.    EquipmentShare and EZ violated the statute when they knowingly and without authorization received, retained, and used confidential and proprietary trade secrets they knew were obtained unlawfully.

158.    As a consequence and proximate result of EquipmentShare and EZ's tampering with Ahern's computer system, Ahern has suffered and will continue to suffer pecuniary loss in the form of actual damages.

**COUNT V**
**AGAINST ALL DEFENDANTS**
**Civil Conspiracy**

159.    Ahern incorporates by reference the allegations contained in the above paragraphs 1 through 126 of this Complaint.

160.    EquipmentShare and EZ conspired with one another to misappropriate and exploit Ahern's confidential and proprietary trade secrets and to compete unfairly against Ahern in violation of the law.

161.    EquipmentShare and EZ committed numerous overt acts in furtherance of the conspiracy including, but not limited to, inducing Ahern's employees to misappropriate Ahern's confidential and proprietary trade secrets before and after their employment with Ahern ended,

unlawfully obtaining Ahern's trade secret information from Ahern's former employees, using the trade secret information belonging to Ahern with the knowledge that it was obtained illegally, EquipmentShare providing Ahern's trade secret information that was unlawfully obtained to EZ, EZ using Ahern's trade secret information, and continuing the use of Ahern's trade secret information despite Ahern's demand for the return of such property.

162.    Alternatively, even if the objectives of EquipmentShare and EZ's conspiracy were to accomplish a lawful purpose, they were in fact accomplished after a meeting of the minds, by unlawful means, including illegally obtaining and possessing Ahern's confidential and proprietary trade secrets.

163.    EquipmentShare and EZ's conspiracy was willful and malicious and performed with an evil motive and reckless indifference to the rights of others, entitling Ahern to punitive damages.

164.    As a direct result of the foregoing conduct undertaken by EquipmentShare and EZ, EquipmentShare and EZ have cause and continue to cause damages to Ahern.  This includes Ahern's attorneys' fees and costs expended to enforce its legal rights.

**COUNT VI**
**AGAINST ALL DEFENDANTS**
**Unjust Enrichment**

165.    Ahern incorporates by reference the allegations contained in the above paragraphs 1 through 126 of this Complaint.

166.    By virtue of the numerous unlawful acts committed by EquipmentShare and its employees, EquipmentShare conferred upon EZ substantial benefits including, but not limited to, misappropriating Ahern's confidential and proprietary trade secrets and unlawfully tampering with Ahern's computer data.

167.    EquipmentShare and EZ enjoyed the benefits of the unlawful procurement and possession of Ahern's confidential and proprietary trade secrets without compensating Ahern for the value of the benefits conferred, even though such benefits were obtained, received, and enjoyed under inequitable and unjust circumstances.

168.    Furthermore, EquipmentShare and EZ enjoyed the benefits of the unlawful procurement and possession of Ahern's confidential and proprietary trade secrets at the expense of Ahern, in that EquipmentShare and EZ's unlawful use of Ahern's trade secrets materially harmed and continues to harm Ahern's business.

169.    Accordingly, it would be unjust to allow EquipmentShare and EZ to retain these benefits they unlawfully obtained and possess.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ahern Rentals, Inc. prays for judgment and relief against Defendants EquipmentShare.com Inc. and EZ Equipment Zone LLC as follows:

1.    An award of compensatory, exemplary, and punitive damages in an amount to be proven at trial, including damages for the expense incurred completing a necessary investigation into Defendants' computer tampering;

2.    Statutory double and treble damages, as applicable;

3.    An award of attorneys' fees and costs incurred in the instant litigation;

4.    An award of pre-judgment and post-judgment interest; and

5.    For such other and further relief as the Court deems just and equitable.

Respectfully submitted,


*/s/ Joseph M. Wientge, Jr.*
Joseph M. Wientge, Jr., #57494MO
JWientge@littler.com
Lindsey Rendlen Latzke #64110MO
llatzke@littler.com
LITTLER MENDELSON, P.C.
600 Washington Avenue
Suite 900
St. Louis, MO  63101
Telephone: 314.659.2000
Facsimile: 314.659.2099

Attorney for Plaintiff Ahern Rentals, Inc.

4837-0517-8572.13 099283.1048